## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT S. DORSEY, II,** | : | **Civil No. 3:19-cv-0113** |
| | : | |
| **Plaintiff** | : | **(Judge Mariani)** |
| | : | |
| **v.** | : | |
| | : | |
| **REBECCA PETER, LPN.,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

### I.    Background

On January 18, 2019, Plaintiff, Robert S. Dorsey, a federal inmate, currently confined in the Fort Dix Federal Correctional Institution, Joint Base MDL, New Jersey, initiated this action pursuant to *Bivens,*[1] 28 U.S.C. § 1331, and the Federal Tort Claims Act ("FTCA"). (Doc. 1, complaint).   Plaintiff complains of incidents which occurred at his former place of confinement, the Allenwood Low Security Correctional Institution ("LSCI-Allenwood"), White Deer, Pennsylvania.   *Id.* The named Defendants are the United States of America and the following Bureau of Prisons ("BOP") employees: Health Services Assistant Rebecca Peters, Case Manager Amy Foura-White, Counselor Mark Thompson, Assistant Health Services

---

[1]    *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *Bivens* stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official."   *Butz v. Economou*, 438 U.S. 478, 504 (1978).

1

Administrator ("AHSA") Bret Brosious, Unit Manager Al Farley, and K. Williams, a licensed practical nurse not represented by the United States Attorney. (Doc. 31 at 9.) On January 31, 2019, Dorsey amended his complaint to add the "U.S. Attorney of the Middle District of PA" and the "U.S. Attorney General of the U.S.A." as Defendants. (Doc. 9).

Plaintiff alleges that as a result of starting his position on March 2, 2016, with the Gate Pass Program at LSCI-Allenwood, he has missed his "call-outs to medical", for dental and eye appointments. (Doc. 1). He claims that "after being transferred to Estill, it was discovered that [he] had Diabetic Macular Edema." *Id*. He avers Defendant Health Services Assistant Peters and Defendant Williams "lied" and stated that he refused a retinopathy exam and falsified an April 18, 2016 medical care treatment refusal form. *Id*.

In September 2016, Plaintiff claims his unit team conducted his six-month review as an orderly with the Gate Pass Program. *Id*. He states that while talking to his case manager, A. Foura-White, he "explained to her [he] was not ready for a transfer" and that she "told [him] that was good because [he] was doing a good job at the Training Center where [he] worked as an orderly" and that "she would review [him] again in six months." *Id*.

Plaintiff filed an informal BP-8 concerning his missed medical appointments, which was responded to on October 6, 2016, by the Health Services Administrator. *Id*. Plaintiff claims that the Health Services Administrator "contradicted policy" by stating that Plaintiff would have received an Incident Report had he missed any appointments. *Id*. Knowing

that he "missed several without repercussions," Plaintiff filed a BP-9, which he claims, "was rejected for frivolous reasons." *Id*. He alleges that he "gave Counselor Mark Thompson another BP-9 to turn in for [him]" and, in turn, "Unit Team Al Farley put [him] in for a transfer as an act of retaliation for the Administrative Remedy [he] was pursuing." *Id*. Plaintiff believes that "[t]he form 409.051 will confirm that the transfer was put in for [him] on the same day 10/04/2016, [he] filed the BP-8." *Id*. Plaintiff concludes that "[t]he results of the retaliation was this Inmate being transferred to a prison further from his home, a major wage reduction was also the result of the retaliation"; "[b]oth an adverse action that being the result of the retaliation." *Id*.

On January 18, 2019, Plaintiff filed the instant action in which he seeks damages "for retaliation, violating policy" and "emotional duress, mental anguish, and physical injury." *Id*. Additionally, Plaintiff seeks a "proper investigation" and for "[s]taff to be reprimanded (fired) for falsifying Government documents, and retaliating against [him] for filing administrative remedy, and obstructing justice." *Id.*

Presently pending before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b), and for summary judgment, pursuant to Federal Rule of Civil Procedure 56. (Doc. 23). The motion is ripe for resolution and, for the reasons set forth below, Defendants' motion to dismiss and for summary judgment will be granted, in part, and denied, in part.

## II.    Legal Standards

### A. Summary Judgment Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record ... or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited

4

materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

"Inferences should be drawn in the light most favorable to the non-moving party, and where

the non-moving party's evidence contradicts the movant's, then the non-movant's must be

taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.

1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380

(2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt
> as to the material facts. Where the record taken as a whole could not lead a rational
> trier of fact to find for the nonmoving party, there is no genuine issue for trial. The
> mere existence of some alleged factual dispute between the parties will not defeat
> an otherwise properly supported motion for summary judgment; the requirement is
> that there be no genuine issue of material fact. When opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the facts for
> purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## B. Motion to Dismiss Standard of Review

A complaint must be dismissed under FED. R. CIV. P. 12(b)(6), if it does not allege

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007). The plaintiff must aver "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct

5

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

"Though a complaint 'does not need detailed factual allegations, ... a formulaic recitation of the elements of a cause of action will not do'." *DelRio-Mocci v. Connolly Prop. Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but ... disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not show[n] - that the

6

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

[E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time. *Id.*

## III. Statement of Undisputed Facts

### A. Background Facts Regarding Dorsey's Classification/Employment

Bureau of Prisons institutions are classified into one of five security levels based upon the level of security and staff supervision. (Doc. 30-1 at 3, Declaration of Jonathan Kerr, Attorney for the Federal Correctional Complex Allenwood Consolidated Legal Center, ("Kerr Decl.")). Similarly, inmates are also classified by their required level of security and staff supervision. *Id.* The lowest security level classification is "minimum." *Id.* Dorsey was classified as an "OUT" custody,[2] minimum security inmate designated to a low security

---

[2]     "OUT" custody is "[t]he second lowest custody level assigned to an inmate requiring the second lowest level of security and staff supervision. An inmate who has OUT custody may be assigned

7

institution, the Allenwood Low Security Correctional Institution in White Deer, Pennsylvania ("LSCI-Allenwood"). *Id.* A low security institution provides a higher level of security than is required for minimum security inmate. *Id.*

The BOP operates an inmate work program within its institutions. *Id.* The purpose of the work program is to reduce inmate idleness while allowing inmates to improve and/or develop useful job skills, work habits, and experiences that will assist in post-release employment and ensures that activities are completed which are necessary to maintain day-to-day operation of the institution. *Id.*; 28 C.F.R. § 545.20. Inmates who are physically and mentally capable of working are required to participate in the work program. *Id.*; 28 C.F.R. § 545.23. Ordinarily, a normal workday consists of a minimum of a seven-hour day. *Id.*; 28 C.F.R. § 545.24. An inmate is expected to report to the place of assignment at the required time and must obtain permission in order to leave a work assignment. *Id.* The Gate Pass Program at LSCI-Allenwood services the administrative areas and the grounds outside of the secure perimeter for all three facilities which make up the Allenwood Federal Correctional Complex (i.e., the United States Penitentiary, Federal Correctional Institution, and LSCI). (Kerr Decl. ¶ 3). There are 18 to 25 inmates in LSCI-Allenwood's Gate Pass Program. *Id.* The Captain of the institution serves as the supervisor for the Gate Pass

---

to less secure housing and may be eligible for work details outside the institution's secure perimeter with a minimum of two-hour intermittent staff supervision." *See* Bureau of Prisons Program Statement 5100.08, Ch., p. 4, found at https://www.bop.gov/policy/progstat/5100_008.pdf.

detail.  *Id*.  An inmate is referred to the Gate Pass program by his unit team who sends the referral to the Warden's office for approval.  *Id*.  Inmates assigned to the Gate Pass Program must meet strict criteria since they must exit and re-enter the secure perimeter. *Id*.  In order to qualify for the Gate Pass Program, an inmate must: (1) be a "minimum" security inmate with "OUT" custody; (2) have clear institutional conduct for 12 months; and (3) be without open charges, warrants, or detainers.  *Id*.  Normally, an inmate will serve on the Gate Pass Program for six months before he is recommended for Camp placement.  *Id*.

On October 4, 2016, Dorsey's unit team submitted a request for Dorsey to be transferred to a lesser security institution after he had successfully completed six months of the Gate Pass Program with good work evaluations.  *Id*.  The transfer request indicated that Dorsey was an OUT custody minimum security inmate with a projected good conduct time release date of February 4, 2023.  *Id*.  Dorsey's unit team recommended that Dorsey be transferred to the Minimum Security Camp in Morgantown, West Virginia, so that he could maintain ties with his family who live in Maryland and Virginia, and to be closer to Maryland where he will reside upon release.  *Id*.  The LSCI Warden signed the transfer recommendation and submitted it to the BOP's Designation and Sentence Computation Center ("DSCC").  *Id.*  The DSCC designated Dorsey to the Minimum Security Camp in Estill, South Carolina.  *Id*.  On November 21, 2016, upon completion of the LSCI Gate Pass Program, Dorsey was transferred to the Minimum Security Camp in Estill, South

Carolina.

## B. Facts Regarding Dorsey's Administrative Remedy History

The Bureau of Prisons has an administrative remedy procedure with respect to inmate complaints, namely 28 C.F.R. § 542.10, *et seq.*

The BOP's Administrative Remedy Program allows an inmate to seek formal review of an issue relating to any aspect of his confinement. 28 C.F.R. § 542.10(a). Before seeking formal review, an inmate must first attempt to resolve the matter informally by presenting his complaint to staff on an Informal Resolution Attempt form commonly referred to as a BP-8. 28 C.F.R. § 542.13(a). If informal resolution is unsuccessful, the inmate may then seek relief from the warden with the submission of a Request for Administrative Remedy, commonly referred to as a BP-9.[3] 28 C.F.R. § 542.14. The deadline for completion of the BP-8 and submission of the BP-9 is twenty days from the date of the event which is the subject of the remedy. *Id.*

If the inmate is not satisfied with the warden's response, he has twenty days from the date of the response to file a BP-10, Regional Administrative Remedy Appeal, with the Regional Director. 28 C.F.R. § 542.15(a). If the response of the Regional Director is not satisfactory, the inmate may then file, within thirty days of the response, a Central Office

---

[3] An exception is made for appeals of discipline hearing officer decisions, which are raised directly to the Regional Director, rather than the warden, and then to the Central Office level. 28 C.F.R. § 542.15(d).

Administrative Remedy Appeal, or BP-11, with the BOP's General Counsel. 28 C.F.R. §

542.15(a). An inmate's appeal to the Central Office is the final administrative level of

appeal in the BOP. 28 C.F.R. § 542.14(b).

A May 6, 2019 search of the Administrative Remedy Generalized Retrieval revealed

that Plaintiff has filed twenty (20) Administrative Remedies since his March 23, 2016 work

assignment to the LSCI-Allenwood Gate Pass Program. (Doc. 30-1 at 3, Kerr Decl.).

Administrative Remedy No. 881036 is the only remedy related to the allegations set forth in

the complaint. *Id*.

On October 6, 2016, Plaintiff received the following response to his October 4, 2016

Informal Grievance (BP-8):

> This is in response to your Inmate Request to Staff dated on October 4, 2016, in
> which you allege staff misconduct pertaining to your refusal of a Retinopathy
> examination.
>
> A review of your allegation was conducted on October 6, 2016, and reveals you
> refused your scheduled Retinopathy examination on April 18, 2016 at 12:00 pm.
> Furthermore, all posted call-outs are required programs. If you did not show for
> your call-out you would have received an incident report.
>
> You are rescheduled for a Retinopathy examination.
>
> I trust this information address your concerns.

(Doc. 40-2 at 10, Inmate Request to Staff Response).

On October 31, 2016, Dorsey filed Administrative Remedy Number 881036- F1 at

11

LSCI-Allenwood pertaining to a medical care treatment refusal form of April 18, 2016.

(Doc. 30-1 at 9, Administrative Remedy Generalized Retrieval). Remedy Number 881036-F1 was rejected the same day it was filed because Dorsey failed to provide the necessary evidence of his informal resolution attempt and because he submitted more than one continuation page. *Id.* Included on the rejection notice were instructions advising Dorsey to write the complaint on one form and one continuation page, and also to include a copy of his informal resolution attempt. *Id.*

On November 3, 2016, Plaintiff emailed the LSCI Health Services Administrator, attempting to obtain a copy of his informal resolution, BP-8, as follows:

> I received your response on 10-6-2016, in regard to alleged misconduct by medical staff (K. Williams & Rebecca Peters). You did not return the bp-8 I wrote on this particular incident that occurred 4-18-2016. I need that bp-8 to satisfy the prongs that are required for the administrative remedy process to go forward.

(Doc. 40-2 at 11). No response was received.

On December 29, 2016, after being transferred to the FCI-Estill Minimum Security Camp, Dorsey submitted Administrative Remedy Number 881036- R1, appealing the rejection to the Northeast Regional Office. (Doc. 30-1 at 9, Administrative Remedy Generalized Retrieval). On December 30, 2016, the Northeast Regional Office rejected the appeal for failing to submit the appeal on the proper form. *Id.* On the rejection notice from the Northeast Regional Office, it was noted that Dorsey should file his appeal to the

Southeast Regional Office, the region where he was currently being confined.   *Id*.   The

Northeast Regional Office also advised that it concurred with LSCI-Allenwood's instructions

for how to properly file at the institution.   *Id*.

On January 27, 2017, Dorsey filed Administrative Remedy Number 881036- R3 at

the Southeast Regional Office, appealing the Northeast Regional Office's rejection.   *Id*.

On January 30, 2017, this appeal was rejected by the Southeast Region because Dorsey

failed to file a BP-9 at the institutional level first.   *Id*.   The Southeast Regional Office

concurred with the previous guidance provided on the rejection notices.   *Id*.

On February 13, 2017, Dorsey again filed an appeal at the Northeast Regional

Office, Administrative Remedy Number 881036-R4.   *Id*.   On February 14, 2017, Dorsey's

appeal was rejected by the Northeast Regional Office because it was not submitted on the

proper form.   *Id*.   The Northeast Regional Office again advised Dorsey that his regional

appeal must be sent to the Southeast Regional Office since he was currently confined in the

southeast region.   *Id*.

On April 11, 2017, Dorsey filed Administrative Remedy Number 881036- R5 at the

Southeast Regional Office to appeal the Northeast Region's rejection.   *Id*.   On that same

day, the Southeast Regional Office rejected the appeal for not filing a BP-9 at the

institutional level first.   *Id*.

On August 28, 2017, Dorsey submitted remedy request number 881036-F2

pertaining to the April 18, 2016 medical care treatment refusal form at the FCI-Estill Minimum Security Camp. *Id*. That same date, the remedy request was rejected by FCI-Estill Minimum Security Camp for being untimely as it was not received within 20 calendar days following the April 18, 2016 event which was the basis for the complaint. *Id*.

On September 26, 2017, Dorsey filed Administrative Remedy Number 881036-R6 at the Southeast Regional Office to appeal the rejection from FCI-Estill Minimum Security Camp. *Id*. On September 27, 2017, the Southeast Regional Office rejected Administrative Remedy Number 881036-R6, agreeing with FCI-Estill Minimum Security Camp that Dorsey's filing was untimely. *Id*.

On November 15, 2017, Dorsey filed Administrative Remedy Number 881036-A1 at the BOP Central Office complaining about the way his administrative remedy was handled. *Id.* On November 16, 2017, the Central Office rejected Administrative Remedy Number 881036-A1, concurring with the prior processing of the remedy and the guidance provided to Dorsey. *Id*. The Central Office noted on the rejection notice that Dorsey could obtain a staff memorandum, pursuant to 28 C.F.R. § 542.14(b), indicating that his filing was late due to no fault of his own, resubmit the remedy at the level it was first rejected, and follow the proper procedures from there. *Id*. Dorsey did not further pursue the remedy.

### C. Facts Regarding Dorsey's Administrative Tort Claim Remedies

On November 28, 2017, Plaintiff submitted Administrative Tort Claim Number TRT-

14

NER-2018-03349, to the BOP's Northeast Regional Office requesting a sum certain of five

million dollars ($5,000,000.00) for negligence related to a missed April 18, 2016 eye

appointment and resultant delayed diabetic macular edema diagnosis. (Doc. 30-1 at 21,

Claim for Damage, Injury or Death). The administrative tort claim alleged staff prevented

inmates working in the Gate Pass Program to return for medical call-outs. *Id*. The

administrative tort claim further alleged that, in an act of retaliation, a transfer request was

submitted on the same day he attempted informal resolution regarding a missed

appointment. *Id*.

Administrative Tort Claim Number TRT-NER-2018-03349 was received by the

Department of Justice on December 18, 2017. By letter dated February 12, 2018, it was

forwarded to the BOP, as it concerned an alleged tort involving the BOP. (Doc. 30-1 at 20).

On September 19, 2018, Administrative Tort Claim Number TRT-NER-2018-03349

was denied as follows:

> Your Administrative Tort Claim Number TRT-NER-2018-03349, properly received on
> February 14, 2018 has been considered for settlement as provided by the Federal
> Tort Claims Act (FTCA), 28 U.S.C. § 2672, under authority delegated to me by 28
> C.F.R. § 543.30. Damages are sought in the amount of $5,000,000.00 based on a
> personal injury claim. Specifically, you allege staff at LSCI Allenwood, did not
> permit you to return to the institution from a gate-pass so you could be present at two
> medical callouts for your eyes. You state the delay in medical care caused you to
> develop diabetic macular edema.
>
> An investigation into your claim, including a review of your medical records, reflects
> on April 7, 2015, you were diagnosed with ophthalmic manifestations and macular

15

edema associated with diabetes. You were advised on diet, blood sugar control and a follow-up appointment was recommended 12 months later. On April 18, 2016, you were scheduled for a follow-up. You refused this appointment, and you refused to sign the Medical Treatment Refusal Form. Staff who worked as compound Officers or Lieutenants during this time, denied they were instructed to disallow gate-pass inmates' access to medical callouts. Several staff stated all gate-pass inmates were given the opportunity to stay inside the institution on the day of a callout or return to the institution prior to the callout appointment. There is no evidence to substantiate your claim that you experienced a compensable loss as a result of negligence on the part of any Bureau of Prisons employee. Accordingly, your claim is denied.

If you are dissatisfied with this decision, you may bring an action against the United States in an appropriate United States District Court within six (6) months of the date of this letter.

(Doc. 30-1 at 26, Northeast Regional Office Response).

### D. Facts Regarding Dorsey's Certificate of Merit

On June 3, 2019, the United States served Dorsey with a notice of its intention to

move for dismissal of his medical negligence claims if he did not file a certificate of merit

within thirty days. (Doc. 30-1 at 31, Notice).

On June 25, 2019, Dorsey served the United States with "Plaintiff's Certificate of

Merit Filing Pursuant to Pennsylvania Rule 1042.3" which he wrote and signed. (Doc. 25,

Certificate of Merit). The Certificate of Merit states Dorsey's belief that,

> under 1042.3 Certificate of Merit expert testimony of an appropriate licensed professional is unnecessary **IF** the investigators SIS, SIA, and BOP staff fully investigate the video surveillance footage that will show inmate Dorsey leaving the housing unit, going to the visitation room to log out, and leaving the institution on the 18th and 19th of April 2016, and returning both days at roughly 1:30 pm. This will

16

prove that Inmate Dorsey never went to the retinopathy exam as scheduled by the call-outs on those days.

*Id*. (emphasis in original).

## IV. Discussion

Defendants seek dismissal of the complaint, and entry of summary judgment, on the following grounds: (1) the *Bivens* claims are barred by the statute of limitations; (2) Dorsey failed to exhaust any of the *Bivens* claims; (3) Dorsey has not obtained a medical expert to establish his FTCA medical negligence claims; and (4) his retaliatory transfer claim is barred by the discretionary function exception to the FTCA. (Doc. 31). The Court will first address Dorsey's *Bivens* claims before turning to the FTCA claim.

### A. *Bivens* Claims

Defendants seek dismissal of Dorsey's complaint based on the fact that his claims are barred by the stature of limitations and that Dorsey has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act of 1996 (the "PLRA").

"A *Bivens* claim, like a claim pursuant to 42 U.S.C. § 1983, is characterized as a personal-injury claim and thus is governed by the applicable state's statute of limitations for personal-injury claims." *Wilson v. United States Gov't*, 735 F. App'x 50, n. 1 (3d Cir. 2018) (internal quotations and citations omitted). In Pennsylvania, the statute of limitations for a

17

personal injury action is two years, subject to any state law tolling provisions that are not inconsistent with federal law. *See* 42 PA. CONS. STAT. § 5524; *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009); *Lake v. Arnold*, 232 F.3d 360, 368 - 69 (3d Cir. 2000). However, it is federal law that determines the date when a cause of action accrues. Under federal law, a civil rights cause of action accrues, and the statute of limitations begins to run, "'when the plaintiff knew or should have known of the injury upon which [his] action is based.'" *Kach*, 589 F.3d at 634 (quoted cases omitted) (brackets added). A "cause of action accrues even though the full extent of the injury is not then known or predictable . . . Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief." *Wallace v. Kato,* 549 U.S. 384, 392 (2007) (internal quotation marks and citations omitted).

Section 1983's statute of limitations is subject to tolling. With respect to prisoner claims, the statute is tolled while the inmate plaintiff exhausts his administrative remedies. *See Pearson v. Sec'y Dept. of Corr.*, 775 F.3d 598, 603 (3d Cir. 2015) ("[T]he PLRA is a statutory prohibition that tolls Pennsylvania's statute of limitations while a prisoner exhausts administrative remedies"). The statute of limitations also may be equitably tolled when the plaintiff was prevented from filing his action in a timely manner due to sufficiently inequitable circumstances.[4] *See Cunningham v. M&T Bank Corp.*, 814 F.3d 156, 160 (3d Cir. 2016)

---

[4]    "[T]o benefit from the equitable tolling doctrine, plaintiffs have the burden of proving three necessary elements: (1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to her lack of reasonable due diligence in attempting to uncover the relevant facts."

(citing *Santos ex rel. Beato v. United States*, 559 F.3d 189, 197 (3d Cir. 2007) ). Finally, "[t]he 'discovery rule' tolls the limitations period where the injured party is unable to know that he is injured and to know what caused the injury, despite the exercise of reasonable diligence." *Brown v. Buck*, 614 F. App'x 590, 593 (3d Cir. 2015) (nonprecedential).

With respect to exhaustion, the PLRA "mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, —— U.S. ——, ——, 136 S. Ct. 1850, 1856, 195 L.Ed.2d 117 (2016); *see Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court—or any other—to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis."). The text "suggests no limits on an inmate's obligation to exhaust-irrespective of 'special circumstances.'" *Id.* And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account. *See Miller v. French*, 530 U.S. 327, 337 (2000) (explaining that "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion")." *Id*. at 1856-57. "Of course, exhaustion applies only when administrative remedies are 'available.' Under certain circumstances, a nominally extant prison grievance policy is not truly an 'available' remedy. *Ross v. Blake*, —— U.S. ——, 136 S. Ct. 1850, 195 L.Ed.2d 117 (2016). This applies when the procedure 'operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates,' where it is 'so opaque that it becomes, practically speaking, incapable of use,' or

---

*Cetel v. Kirwan Fin. Grp., Inc.,* 460 F.3d 494, 509 (3d Cir. 2006).

'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' *Id.* at 1859-60." *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019).

The PLRA mandates that an inmate "properly" exhaust administrative remedies before filing suit in federal court, which demands compliance with an agency's deadlines and other procedural rules. *Woodford v. Ngo*, 548 U.S. 81, 92 (2006); *Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004) (concluding that the PLRA includes a procedural default component); *Rivera v. Pa. Dep't of Corr.*, 388 F.App'x 107, 108 (3d Cir. 2010) (stating "[a]n inmate must exhaust his administrative remedies prior to filing a civil action in federal court."). Inmates who fail to fully, or timely, complete the prison grievance process, or who fail to identify the named defendants, are barred from subsequently litigating claims in federal court. *See Spruill*, 372 F.3d 218. Notably, prison administration must also comply with the demands of the system. "[A]s soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement." *Shifflett*, 934 F.3d at 365.

The record before the Court establishes that the only issue presented for exhaustion is Plaintiff's claim that he was prevented from attending a scheduled eye appointment, which resulted in a delayed diagnosis of diabetic macular edema. There is no record of Plaintiff initiating the administrative remedy process with respect to his retaliatory transfer claim. Accordingly, summary judgment will be granted in favor of Defendants for Plaintiff's

failure to exhaust administrative remedies with respect to the retaliatory transfer claim. Additionally, Defendants are also entitled to judgment on the timeliness of this claim. Any claim with respect to Plaintiff's transfer, initiated on October 4, 2016, and effectuated on November 21, 2016, is barred by the statute of limitations, as Plaintiff did not file the instant action until January 18, 2019; well after the two year statute of limitations.

As to Plaintiff's claim that he was prevented from attending a scheduled eye appointment, the record reveals that Dorsey's obligation to exhaust was obviated at the very beginning of the process when his initial grievance was rejected on October 31, 2016, not as untimely, but for Plaintiff's failure to attach a copy of his BP-8. On November 3, 2016, within three days of the October 31, 2016 rejection, Plaintiff attempted to cure this deficiency by requesting a copy of his BP-8 from prison officials. (Doc. 40-2 at 11). Plaintiff received no response to his request. Defendants do not dispute this. Defendants' failure to provide Plaintiff with a copy of his BP-8, foreclosed his ability to properly begin the administrative remedy process with the filing of a BP-9, resulting in a domino effect of rejections and creating a procedure which, in the words of *Shifflett*, "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," where it is "so opaque that it becomes, practically speaking, incapable of use," or "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Shifflett*, 934 F.3d at 1859-60. Dorsey's decision to continue working through the prison's internal system in good faith did not waive or negate his successful exhaustion of remedies as required by the PLRA. *Id*.

Thus, applying the recent holding to the record before us, we are compelled to conclude that Dorsey's administrative remedies were rendered unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement. As such, Defendants are precluded from summary judgment, and Dorsey may proceed on his claim that he was prevented from attending a scheduled eye appointment, which he alleges resulted in a delayed diagnosis of diabetic macular edema.

Moreover, because Plaintiff was attempting, in good faith, to navigate the successful exhaustion of his administrative remedies, the Court finds that the statute of limitations was tolled during this time. *See Pearson*, 775 F.3d at 603. The record reveals that Plaintiff's November 15, 2017 appeal to final review before the Central Office was rejected on November 16, 2017, with the Central Office concurring with the prior processing of the remedy and the guidance provided to Dorsey. *Id*. Thus, the two-year statute of limitations began to run on November 16, 2017 and expired on November 16, 2019. Accordingly, Plaintiff's complaint, filed on January 18, 2019, alleging that he was prevented from attending a scheduled eye appointment, is timely filed and may proceed. Consequently, Defendants' motion for summary judgment, based on the timeliness of Plaintiff's claim regarding his eye appointment, will be denied.

## B. FTCA Claim

### 1. Certificate of Merit

Dorsey asserts a claim under the FTCA that the diagnosis of his eye condition was

delayed because staff prevented him from attending his eye appointment. The United

States argues that Dorsey's FTCA claim must be dismissed because he failed to file a

certificate of merit. [5] Specifically, Defendant argues that "the only way Dorsey can establish

*prima facie* claims of medical negligence is by presenting evidence from a medical expert

who could opine whether any delay in diagnosis of Dorsey's alleged condition or treatment

was causally related to any injury for which Dorsey seeks compensation." (Doc. 31 at 25).

However, it has been determined that prison staff preventing a prisoner from receiving

prescribed medication and preventing a prisoner access to outside medical care can also be

based upon theories of ordinary negligence. *Jones v. United States*, 91 F.3d 623, 625 (3d

Cir. 1996) (Under 18 U.S.C. § 4042, which sets forth the duty of care by the BOP to federal

---

5    Pennsylvania Rule of Civil Procedure 1042.3 requires that a plaintiff file a certificate of merit ("COM") from a medical expert with respect to a professional negligence claim against the United States. Rule 1042.3 provides as follows:

(a) In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party that either

(1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or

(2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or

(3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.

PA. R. CIV. P. 1042.3(a).

prisoners, a prisoner has an ordinary negligence cause of action for prison personnel's

failure to provide prescribed medication); *Boyd v. United States*, 2006 WL 2828843, at 5

(M.D. Pa. Sept. 29, 2006) ("A delay in scheduling medically necessary care for non-medical

reasons could stand as the basis of a claim of negligence against BOP medical

personnel."). If a FTCA claim sounds in ordinary negligence, rather than professional

negligence, a certificate of merit is not necessary. *See* PA. R. CIV. P. 1042.3(a).

In *Balter v. United States*, 2014 WL 1365905 (M.D. Pa. 2014), this Court set forth the

proper inquiry courts should make when determining whether a claim is one of ordinary

negligence, rather than medical malpractice, as follows:

> To determine whether a plaintiff's claim is one of ordinary or professional negligence,
> courts must look to the substance, rather than the form, of the complaint.... [T]he
> Pennsylvania Supreme Court stated that whether a negligence claim is "professional
> versus ordinary negligence deals primarily with the breach of a professional standard
> of care." *Merlini*, 980 A.2d at 507. The Pennsylvania Superior Court distinguished
> medical malpractice from ordinary negligence as follows:

>> A medical malpractice claim is distinguished by two defining
>> characteristics. First, medical malpractice can occur only within the
>> course of a professional relationship. Second, claims of medical
>> malpractice necessarily raise questions involving medical judgment.
>> Claims of ordinary negligence, by contrast, raise issues that are within
>> the common knowledge and experience of the [fact-finder].
>> Therefore, a court must ask two fundamental questions in determining
>> whether a claim sounds in ordinary negligence or medical malpractice:
>> (1) whether the claim pertains to an action that occurred within the
>> course of a professional relationship; and (2) whether the claim raises
>> questions of medical judgment beyond the realm of common
>> knowledge and experience. If both these questions are answered in
>> the affirmative, the action is subject to the procedural and substantive
>> requirements that govern medical malpractice actions.

> *Ditch v. Waynesboro Hosp.*, 917 A.2d 317, 322 (Pa. Super. Ct. 2007)

In sum, "a complaint 'sounds in malpractice' where 'the conduct at issue constituted an integral part of the process of rendering medical treatment.'" *Iwanejko v. Co. hen & Grigsby, P.C.*, 249 Fed. Appx. 938, 944 (3d Cir. 2007) (quoting *Ditch v. Waynesboro Hosp.*, 917 A.2d 317, 323 (Pa. Super. 2007).

*Id. at* \*25.   *See also Medley v. United States*, 2016 WL 3913575, at \*6-7 (M.D. Pa. Apr. 6, 2016), *report and recommendation adopted*, 2016 WL 3908400 (M.D. Pa. July 19, 2016).

Applying this inquiry to the instant case, Dorsey's claim is that non-medical prison staff prevented him from attending a scheduled eye appointment, which resulted in a delayed diagnosis of diabetic macular edema.   Thus, it cannot be said at this time that Plaintiff could not present a viable FTCA claim for ordinary negligence.   As such, Plaintiff's ordinary negligence claim against the individual Defendants does not involve professional negligence and no certificate of merit is necessary.   Consequently, Defendants' motion for summary judgment, based solely on Plaintiff's failure to provide a certificate of merit, will be denied.

### 2. Retaliation Claim

Plaintiff claims that Defendants transferred him in retaliation for filing an administrative remedy claim.   (Doc. 30-1 at 25).

Pursuant to the FTCA, Congress has consented to liability for money damages suits against the United States for injury or loss of property "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."   28 U.S.C. § 1346(b)(1).   The FTCA allows recovery for damages for personal injuries sustained during confinement in a federal prison by reason of the

negligence of a government employee. 28 U.S.C. § 2674; *United States v. Muniz*, 374

U.S. 150(1963).

Dorsey alleges that Defendants retaliated against him because he filed an

administrative claim. (Doc. 30-1 at 25). A retaliation claim is not viable under the FTCA,

as the FTCA does not provide a remedy for constitutional torts. *See F.D.I.C. v. Meyer*, 510

U.S. 471, 478 (1994); *Williams v. United States*, 242 F.3d 169, 175 (4th Cir. 2001).

Because the FTCA contains no waiver of immunity for claims of federal constitutional

violations, Dorsey's retaliation claim is not cognizable under the FTCA and will be

dismissed.[6] *See Coudon v. Duffy*, 446 F.3d 483, 499 (3d Cir. 2006) (finding that "the

United States is not liable under the FTCA for money damages for suits arising out of

constitutional violations"); *James v. United States*, 2009 WL 2605305, at *5 (W.D. Pa. 2009)

("It is well-settled that the FTCA does not waive the United States' sovereign immunity for

constitutional torts that may have been committed by its employees"). Accordingly,

Defendants are entitled to judgment as a matter of law on Plaintiff's retaliation claim under

the FTCA.

## V. Conclusion

Based on the foregoing discussion, Defendants' motion to dismiss and for summary

judgment will be granted as to Plaintiff's unexhausted and untimely *Bivens* retaliatory

---

6    Because Plaintiff's retaliation claim is not cognizable under the FTCA, the Court need not
reach Defendants' argument that his retaliatory transfer claim is barred by the discretionary
function exception to the FTCA.

26

transfer claim. Defendants are also entitled to judgment as a matter of law on the basis that Plaintiff's retaliation claim fails to raise a cognizable claim.

Defendants' motion to dismiss and for summary judgment will be denied as to Plaintiff's *Bivens* action challenging the alleged denial of the April 18, 2016 Retinopathy examination and as to Plaintiff's FTCA claim requiring a certificate of merit.

A separate Order shall issue.

Dated: February 21, 2020

Robert D. Mariani
United States District Judge