## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT S. DORSEY, II,                    :        Civil No. 3:19-cv-0113
                                         :
             Plaintiff                   :        (Judge Mariani)
                                         :
        v.                               :
                                         :
REBECCA PETERS, *et al.,*                :
                                         :
             Defendants                  :

## MEMORANDUM

### I.    Background

On January 18, 2019, Plaintiff, Robert S. Dorsey, a former federal inmate,[1] initiated

this action pursuant to *Bivens,*[2] 28 U.S.C. § 1331, and the Federal Tort Claims Act (FTCA).

(Doc. 1, complaint).  Plaintiff complains of incidents which occurred at his former place of

confinement, the Allenwood Low Security Correctional Institution ("LSCI-Allenwood"), White

Deer, Pennsylvania.  *Id.*  The named Defendants are the United States of America and the

following Bureau of Prisons (BOP) employees: Health Services Assistant Rebecca Peters,

Case Manager Amy Foura-White, Counselor Mark Thompson, Assistant Health Services

Administrator (AHSA) Bret Brosious, and Unit Manager Al Farley.  *Id.*  On January 31, 2019,

---

[1]    Plaintiff was released from custody subsequent to the filing of the instant action and currently resides at 5309 Cumberland Street, Capitol Heights, Maryland.

[2]    *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *Bivens* stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." *Butz v. Economou*, 438 U.S. 478, 504 (1978).

Dorsey amended his complaint to add the "U.S. Attorney of the Middle District of PA" and the "U.S. Attorney General of the U.S.A." as Defendants.  (Doc. 9).

Plaintiff alleges that as a result of starting his position on March 2, 2016, with the Gate Pass Program at LSCI-Allenwood, he has missed his "call-outs to medical", for dental and eye appointments.  (Doc. 1).  He claims that "after being transferred to Estill, it was discovered that [he] had Diabetic Macular Edema."  *Id*.  He avers Health Services Assistant Peters and Defendant Williams "lied" and stated that he refused a retinopathy exam and falsified an April 18, 2016 medical care treatment refusal form. *Id*.

In September, 2016, Plaintiff claims his unit team conducted his six-month review as an orderly with the Gate Pass Program. *Id*.  He states that while talking to his case manager, A. Foura-White, he "explained to her [he] was not ready for a transfer" and that she "told [him] that was good because [he] was doing a good job at the Training Center where [he] worked as an orderly" and that "she would review [him] again in six months."  *Id*.

Plaintiff filed an informal BP-8 concerning his missed medical appointments, which was responded to on October 6, 2016, by the Health Services Administrator.  *Id*.  Plaintiff claims that the Health Services Administrator "contradicted policy" by stating that Plaintiff would have received an Incident Report had he missed any appointments.  *Id*.  Knowing that he "missed several without repercussions," Plaintiff filed a BP-9, which he claims, "was rejected for frivolous reasons."  *Id*.  He alleges that he gave Counselor Mark Thompson another BP-9 to turn in for [him]" and, in turn, "Unit Team Al Farley put [him] in for a transfer

as an act of retaliation for the Administrative Remedy he was pursuing" *Id*.  He believes that

the form 409.051 will confirm that the transfer was put in for [him] on the same day

10/04/2016, [he] filed the BP-8." *Id*.  Dorsey concludes that "the results of the retaliation was

this Inmate being transferred to a prison further from his home, a major wage reduction was

also the result of the retaliation"; both an adverse action that being the result of the

retaliation." *Id*.

On January 18, 2019, Plaintiff filed the instant action in which he seeks damages "for

retaliation, violating policy" and "emotional duress, mental anguish and physical injury." *Id*.

Additionally, Plaintiff seeks a "proper investigation" and for "staff to be reprimanded (fired)

for falsifying Government documents and retaliating against [him] for filing administrative

remedy and obstructing justice." *Id.*

By Memorandum and Order dated February 21, 2020, the Court granted Defendants'

motion to dismiss and for summary judgment as to Plaintiff unexhausted, and untimely

*Bivens* retaliatory transfer claim and Plaintiff's FTCA retaliation claim.  (Docs. 42, 43).  The

Court denied Defendants' motion to dismiss and for summary judgment as to the exhaustion

of Plaintiff's *Bivens* action challenging the alleged denial of the April 18, 2016 Retinopathy

examination claim, and as to Plaintiff's failure to file a certificate of merit in support of his

FTCA claim.  *Id*.

By Memorandum and Order dated March 29, 2021, the Court granted Defendants'

motion for partial judgment on the pleadings on the following three (3) grounds:  (1)

Plaintiff's *Bivens* claim against the United States and against Defendants Peters, Foura-White, Thompson, Brosius and Farley, in their official capacities; (2) Plaintiff's FTCA claims against the seven individually named Defendants[3], as the only proper Defendant to the FTCA claims is the United States; and (3) Plaintiff's unexhausted and untimely *Bivens* retaliatory transfer claim and as to Plaintiffs FTCA retaliation claim.[4]  (Docs. 63, 64). Defendants' motion for partial judgment on the pleadings was denied with respect to Plaintiff's claims against Defendant Peters.  *Id.*  After the completion of these two rounds of dispositive motions, two Defendants, Health Services Assistant Peters and the United States remain, along with the following two claims:

1.    On April 18, 2016, Defendant Health Services Assistant Peters "lied," and stated Plaintiff refused a retinopathy exam, and;

2.    The United States was negligent in Plaintiff's medical care/treatment which allegedly delayed a diagnosis of diabetic macular edema.

(Doc. 1 at 2-3).

Presently before the Court are the parties' cross motions for summary judgment. (Docs. 91, 92).  The motions are fully briefed and, for the reasons set forth below, the Court will grant summary judgment in favor of Defendants and against the Plaintiff, with respect to Plaintiff's remaining two claims.

---

3    The Clerk of Court was directed to enter judgment in favor of Defendants Foura-White, Thompson, Williams, Brosius, Farley, "U.S. Attorney of the Middle District of PA" and "U.S. Attorney General of the U.S.A" and against the Plaintiff.

4   The Clerk of Court was directed to enter judgment in favor of Defendants Farley, Foura-White, Thompson and Brosius.

II.   <u>**Legal Standard**</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248(1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record ... or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the nonmoving party, and where the non-moving party's evidence

contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), cert. denied 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id*. (internal quotations, citations, and alterations omitted).

Courts are permitted to resolve cross-motions for summary judgment concurrently. *See Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008); *see also Johnson v. Fed. Express Corp.,* 996 F.Supp.2d 302, 312 (M.D. Pa. 2014); 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2720 (3d ed. 2015). When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion. Fed. R. Civ. P. 56; *Lawrence*, 527 F.3d at 310 (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).

## III. <u>Statement of Undisputed Facts</u>[5]

### A. Background Facts Regarding Dorsey's Classification/Employment

The BOP operates an inmate work program within its institutions, whose purpose is

to reduce inmate idleness while allowing inmates to improve and/or develop useful job skills,

work habits, and experiences that will assist in post-release employment and ensures that

activities are completed which are necessary to maintain day-to-day operation of the

institution. 28 C.F.R. § 545.20. Inmates who are physically and mentally capable of

working are required to participate in the work program. 28 C.F.R. § 545.23. Ordinarily, a

normal workday consists of a minimum of a seven-hour day. 28 C.F.R. § 545.24.

The Gate Pass Program at LSCI-Allenwood services the administrative areas and

the grounds outside of the secure perimeter for all three facilities which make up the

Allenwood Federal Correctional Complex (i.e., the United States Penitentiary, Federal

Correctional Institution, and LSCI). (Doc. 100-2 at 1, Peters Decl. ¶ 2). There are 18 to 25

inmates in LSCI-Allenwood's Gate Pass Program. *Id.* The Captain of the institution serves

as the supervisor for the Gate Pass detail. *Id.* An inmate is referred to the Gate Pass

---

[5]   Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." Local Rule of Court 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.* The factual background herein is derived from Defendants' Rule 56.1 statement of material facts. (Doc. 100). Dorsey did not file a statement of material facts in support of his motion for summary judgment, nor did he file a response to Defendants' statement of material facts. The Court accordingly deems the facts set forth by Defendants to be undisputed. See Local Rule of Court 56.1.

program by his unit team who sends the referral to the Warden's office for approval. *Id*.

Inmates assigned to the Gate Pass Program must meet strict criteria since they must exit

and re-enter the secure perimeter. *Id*. An inmate must: (1) be a "minimum" security inmate

with "OUT" custody;[6] (2) have clear institutional conduct for 12 months; and (3) be without

open charges, warrants, or detainers. *Id*. Normally, an inmate will serve on the Gate Pass

Program for six months before he is recommended for Camp placement. *Id*.

On March 23, 2016, Dorsey was assigned to the LSCI-Allenwood's Gate Pass

Program as a training center orderly. *Id.* He remained in this position until his November 21,

2016, transfer to a Minimum-Security Camp after successful Gate Pass Program

completion. *Id*.

All inmate work details, including Gate Pass, allow for inmates to attend medical

callouts. (Doc. 100-2 at 1, Peters Decl. ¶ 3.) As conveyed to Plaintiff during his attendance

at the LSCI-Allenwood Institution Admission and Orientation, and additionally set forth in the

Admission and Orientation handbook of which Plaintiff acknowledged receipt, callouts are a

scheduling system for appointments (which include hospital, dental, educational, team

meetings and other activities) and are posted each day on TRULINCS Computer System

located in the housing unit. *Id*. Callouts can be viewed on the day preceding the

---

[6] "OUT" custody is "[t]he second lowest custody level assigned to an inmate requiring the second lowest level of security and staff supervision. An inmate who has OUT custody may be assigned to less secure housing and may be eligible for work details outside the institution's secure perimeter with a minimum of two-hour intermittent staff supervision." *See* Bureau of Prisons Program Statement 5100.08, Ch., p. 4, found at https://www.bop.gov/policy/progstat/5100_008.pdf.

appointment.  *Id*.  It is the inmate's responsibility to check for appointments daily and be at

the appointment at the designated time.  *Id*.  Appointments for on-site routine medical and

dental care are issued at the triage area in the Health Services Department.  *Id*. The inmate

is to present this medical appointment callout slip to the work supervisor.  *Id*.  If an inmate is

confused or concerned with attending an appointment due to work responsibilities or does

not have the medical callout slip, he is instructed to ask his work supervisor or unit officer to

call the Health Service Department.  *Id*.  Health Services staff then will determine if, and/or

when an appointment is scheduled, thereby excusing the inmate from work that day.  *Id*.

Appointments for other medical evaluations, tests, and clinics (such as eye exams, blood

studies, optometry clinics, physician visits, etc.) are scheduled via the institution callout

roster.  *Id*.  It is the responsibility of the inmate to review the daily callout roster and show up

on time for all appointments.  *Id*.

Unlike regular medical callouts for appointments with on-site BOP providers, when

Gate Pass inmates would be scheduled in the afternoon after their return from work; LSCI-

Allenwood could not schedule specialist consultants around the Gate Pass program.  (Doc.

100-2, Peters Decl. ¶ 4.)  Therefore, when a Gate Pass program inmate was scheduled for

a specialist consultation clinic, which often occurred in the morning or mid-morning, they

were excused from work for the entirety of that day, thereby forfeiting pay.  *Id*.  The

scheduling was irregular and dictated by the specialist provider.  *Id*.  Ordinarily, optometry

clinics occurred in the morning or mid-morning, lasted for two hours with approximately

twenty-five inmates being evaluated during each optometry clinic. *Id*. For an optometry clinic appointment, the inmate would appear on the institution callout roster formally excusing them from work for the day. *Id*.

The role of Defendant, Rebecca Peters, Health Services Assistant, is limited to ministerial tasks within the Health Services Department. (Doc. 100-2 at 2). She was not ordinarily present during the clinics with her duties being limited to coordinating, cross-referencing, and determining which inmates had outstanding optometry consultation referrals and placing them on the schedule once the specialist determined when they would next hold their clinic. *Id*. Correctional Services staff would then receive and publish the medical callouts. *Id*.

On April 7, 2015, Plaintiff was seen by optometrist, James Weyland, OD, for complaints of eyes/vision problems. (Doc. 100-4 at 10). Dr. Weyland determined that Plaintiff presented with evidence of diabetes, type II with ophthalmic manifestations. *Id*. He recommended a follow-up in one year. *Id*.

On April 18, 2016, Plaintiff missed his one-year follow-up diabetic retinopathy exam. (Doc. 100-4 at 19). As a result of the missed appointment, Plaintiff was required to sign a Medical Treatment Refusal form. (Doc. 100-4 at 19). Dorsey refused to sign the Medical Treatment Refusal form. *Id*. The form, which was prepared on April 18, 2016, indicates that Dorsey was counseled on April 18, 2016, by Nurse Williams, who is not a named Defendant in the instant action and Plaintiff's refusal to sign was witnessed by Defendant Peters on

April 19, 2016.  *Id*.

## B.  Facts Regarding Dorsey's Medical History

Plaintiff's five-year medical history, summarized by expert Joshua Greene, M.D., is

as follows:

The earliest visit recorded was from February 22, 2012. Visual acuity was excellent at 20/25 and 20/30 in the right and left eyes respectively.  Vision was about the same at the next visit on April 7th, 2015: the optometrist, James Weyland, OD stated (in his assessment) that the patient demonstrated evidence of diabetes with ophthalmic manifestations.  Dr. Weyland asked Mr. Dorsey to follow up for another examination in one year.   Interval documentation included a Medical Treatment Refusal form dated April 18th, 2016: the signature line read "refused to sign".  The next office note was from January 12th, 2017. The vision was tremendous at 20/20 in both eyes, but the retinal examination did reveal mild-to-moderate diabetic retinal changes with an area in the left eye suspicious for macular edema.

On February 22nd, 2017 he was seen at Affiliated Retinal Consultants by Scott Anfinson, MD.  His records indicated mild diabetic changes in each eye with macular edema in the left eye.  Mr. Dorsey underwent focal laser therapy in the left eye at the same visit and was scheduled to return in a month for laser in the right eye.  He went back to Dr. Anfinson on August 9th, 2017 at which time vision was still excellent in each eye. Focal laser was applied to the right eye at this visit and a four month follow up was scheduled.  An interim exam by optometry demonstrated an acuity of 20/20 in each eye: the retinal appearance had not changed significantly.   The next retina appointment took place on October 31st, 2018 at which time Dr. Anfinson concluded that both eyes were stable.   The last note from Affiliated Retinal Consultants was recorded on January 23rd, 2019.  Both the vision and retinas were unchanged in each eye. A four-month return was planned, but never occurred.

There were supplemental visits with Dr. Feigenbutz, a prison health services optometrist in 2020 and 2021, however there were no substantial changes discovered on those examinations.

Mr. Dorsey has a past ocular history significant for background diabetic retinopathy and diabetic macular edema in both eyes. He is also a glaucoma

suspect and uses no prescription eyedrops. His past medical history includes diabetes, hypertension, high cholesterol, hypothyroidism, and renal stones. His systemic medications include atorvastatin, glipizide, levothyroxine, lisinopril, metformin, pioglitazone, aspirin, ibuprofen, and glyburide.

There were supplemental visits with Dr. Feigenbutz, a prison health services optometrist in 2020 and 2021, however there were no substantial changes discovered on those examinations.

(Doc. 100-3 at 2-3; Doc. 100-4 at 36-5).

## IV. <u>Discussion</u>

### A. **Negligence Claim under the FTCA**

By virtue of the FTCA, Congress has consented to liability for money damages suits against the United States for injury or loss of property "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). The FTCA allows recovery for damages for personal injuries sustained during confinement in a federal prison by reason of the negligence of a government employee. 28 U.S.C. § 2674; *United States v. Muniz*, 374 U.S. 150 (1963).

In considering an FTCA claim, the law of the place where an act or omission occurs is to be applied. 28 U.S.C. § 1346(b). Because LSCI-Allenwood is in Pennsylvania, Pennsylvania law applies. Under Pennsylvania law, a plaintiff must prove the following elements to establish a *prima facie* claim for negligence: "(1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the harm in question; and (4) the plaintiff incurred actual loss or damage."

12

*Krentz v. Consol. Rail Corp.*, 589 Pa. 576, 910 A.2d 20, 27 (Pa. 2006). In cases that involve federal prisoners, it has been recognized that the government's duty of care is one of ordinary diligence, meaning that the United States must "exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by him." *See* 18 U.S.C. § 4042; *Turner v. Miller*, 679 F.Supp. 441, 443 (M.D. Pa. 1987). The applicable law with respect to the burden and quantum of proof under the FTCA remains that of the state in which the alleged tortious conduct occurred. *Hossic v. United States*, 682 F. Supp. 23, 25 (M.D. Pa. 1987). Under Pennsylvania law, a plaintiff is required to show that the defendant's negligence was a factual cause of his injury by a preponderance of the evidence. *See Gorman v. Costello*, 929 A.2d 1208 (Pa. Super. 2007); Pa. S.S.J.I. (Civ.) 13.00, 13.20.

The United States argues that Dorsey cannot make the requisite showing to establish a *prima facie* negligence claim. (Doc. 10 at 42-46). Specifically, the United States argues that there was no duty owed to Dorsey that was breached by the United States and, even if there was a breach of duty, Dorsey has failed to allege any injury as a result. *Id*. The Court agrees.

In support of its motion, the Government produced the Admission and Orientation Handbook, that Plaintiff acknowledged receipt of, which shows that callouts are a scheduling system for appointments (which include hospital, dental, educational, team meetings and other activities) and are posted each day on TRULINCS Computer System

located in the housing unit.  Callouts can be viewed on the day preceding the appointment.

It is the inmate's responsibility to check for appointments daily and be at the appointment at

the designated time.  Appointments for on-site routine medical and dental care are issued at

the triage area in the Health Services Department.  The inmate is to present his medical

appointment callout slip to the work supervisor.  If an inmate is confused or concerned with

attending an appointment due to work responsibilities or does not have the medical callout

slip, he is instructed to ask his work supervisor or unit officer to call the Health Service

Department.  Health Services staff then will determine if, and/or when an appointment is

scheduled, thereby excusing the inmate from work that day.  Appointments for other

medical evaluations, tests, and clinics (such as eye exams, blood studies, optometry clinics,

physician visits, etc.) are scheduled via the institution callout roster.  It is the responsibility of

the inmate to review the daily callout roster and show up on time for all appointments.

There is no record evidence to indicate that Plaintiff was impeded or prevented, in any way,

from attending his April 18, 2016 one-year follow-up diabetic retinopathy exam.  Thus, it is

clear from the record and the Admission and Orientation Handbook that the United States

did not have a legal duty to see that Plaintiff attended his April 18, 2016 medical

appointment.  As such, there is no material dispute of fact that the United States did not

breach any legal duty owed to Dorsey but, rather, Dorsey is responsible for not attending

the appointment.  Absent proof of a duty owed and supporting evidence from which a

reasonable factfinder could conclude a breach occurred, Dorsey has failed to overcome the

United States' motion for summary judgment.  *See Celotex,* 477 U.S. at 323. ("[T]here can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Moreover, even if Dorsey were able to establish a *prima facie* negligence claim, he fails to establish a causal connection between his alleged injury and the employee's alleged breach of duty.  Here, the uncontroverted medical expert opinion of Dr. Joshua M. Greene, establishes that there was no injury suffered by Dorsey not attending his April 18, 2016 one-year follow-up diabetic retinopathy exam.  (*See* Doc. 100-3 at 3-5).  After a thorough record review of Plaintiff's medical history, Dr. Greene made the following assessment:

> Mr. Dorsey had been diagnosed with type 2 diabetes for about 3 years before the first optometry records indicated the presence of ocular complications from this disease (medical records mentioned that his diabetes was diagnosed on April 5th, 2012).  Population based studies suggest that given his duration of diabetes at the time of his examination on April 7th, 2015, the probability that he had diabetic retinopathy of any severity would be about 25-30%.  He would be at slightly higher risk due to his history of hypertension, high cholesterol, and labile blood sugar control.  The lowest severity of diabetic retinal disease is mild non-proliferative diabetic retinopathy which is managed with an annual examination schedule.  The office note from April 7th, 2015 documented a normal retinal exam but was coded based on the presence of diabetic retinal findings. If we assume that the coding represented the correct information (ie: there was diabetic retinopathy), the return visit that was arranged for 1 year would support the notion that said retinopathy was mild in severity.
>
> Many patients with lower levels of diabetic retinopathy are safely observed for years. Individuals with mild and moderate diabetic retinopathy have an annual risk of progression (to more severe levels with increased risk of vision loss) of 5% and 12% respectively.  Even when retinopathy deteriorates, it often happens over many months or years which would be consistent with the

suggestion of annual visits for lower levels of disease. We can look at the notes from Affiliated Retinal Consultants for clarification. Mr. Dorsey was seen (and lasered) on February 22nd, 2017. He was instructed to follow up a month later but didn't' return until August 9, 2017 almost 6 months late. At the August visit, the retinal examination was virtually unchanged. In fact, if we look through all the retinal visits over two years, the severity of retinopathy did not fluctuate according to Dr. Anfinson. As a full-time retina surgeon, I submit that the clinical information above is an accurate representation of the slow progression in patients with mild-to-moderate retinopathy.

Using this information, we can answer the questions raised about this case.

Based on the data in the medical record and the assumptions detailed above, there was no delayed diagnosis of mild non-proliferative diabetic retinopathy. As stated earlier, the coding recorded under the "assessment" of the examination dated April 7th, 2015 referenced diabetes with ophthalmic manifestations. When this information is juxtaposed with the 1 year follow up, we can conclude that mild non-proliferative diabetic retinopathy was diagnosed in 2015. It would still be there in April of 2016 when the missed examinations occurred. There was no macular edema in 2016, nor would edema have been developing in 2016 because it was recorded as minimal (in its earliest stages of development and detection in 2017 according to Dr. Anfinson.

The clinical trajectory of diabetic retinal disease can be summarized as follows. A patient with diabetes may have systemic disease without any retinal findings for years. When retinal changes appear, they are often in the form of pinpoint vascular abnormalities scattered throughout the retina (to the physician, they look like red dots appearing on a homogenous background of orange tissue): these lesions are sparse as the disease develops but increase in number and density as sickness progresses. When labeling the severity of this condition, our description is commensurate with the retinal exam: mild non-proliferative diabetic retinopathy (synonymous with background retinopathy) refers to one or two lesions. Moderate then severe retinopathy illustrates an increasing number of vascular anomalies spread throughout the retina. All the aforementioned findings indicate diabetic retinal disease, but if we don't see macular edema (swelling in the center of the retina), these patients do not need any treatment, only periodic examinations. The suggested frequency of exams mirrors the significance of disease: mild is followed annually, moderate every 6 months, and severe every 3-6 months or more often if needed. To be sure, the only change that requires treatment at these levels of retinopathy is macular

edema.

With this information in mind, we can understand and explain what was happening from an ophthalmic standpoint from 2015 to 2017. Mr. Dorsey had mild non-proliferative diabetic retinopathy without macular edema in 2015 and was therefore told he needed no treatment and should return in a year. Although he missed his appointment in 2016, we know that his retinal exam would have been largely unchanged: specifically, he would not have had any macular edema and would have been told to return in another year. In 2017 he was noted to have a new finding: macular edema. We know that this was a recent development (beginning a month or two before the diagnostic exam in 2017) because the swelling was so subtle, the first examiner wasn't sure it was there. In fact, the clinical note featured a question mark next to the retinal drawing. This punctuation is often employed by a doctor (your truly included) when we aren't 100% sure of something. This uncertainty was vindicated the next month by the retinal specialist Dr. Anfinson, because at Affiliated Retinal Consultants the edema barely made it above the threshold required for treatment. The laser therapy that was applied to the left and then the right eye, was done to reduce the swelling and stabilize the vision. This laser is often used to maintain not restore vision. Moreover, it is often reserved for edema that is shallow and poses a low visual risk to the patient. Indeed, most patients with diabetic macular edema are not candidates for laser but are relegated to treatments where medication is injected into the eye on a monthly basis in perpetuity.

The health records indicate that despite attendance issues in 2016, there was no delay in treatment as there was no delay in diagnosis. Moreover, there was no worsening of any condition related to the missed appointments. Non-proliferative diabetic retinopathy without macular edema (the case in 2015 and almost certainly in 2016) is almost always managed with observation. If the visit in 2016 had come to fruition, there would have been no treatment recommendations. Rather Mr. Dorsey would have been told to keep his blood sugar down and return in a year, as was the disposition in 2015.

Mr. Dorsey's prognosis following the missed appointments in 2016 is excellent. I was able to review ocular visits extending almost 5 years beyond the concerns in 2016. The visual acuity has remained almost perfect in each eye. Given his good glycemic control (his hemoglobin A1C was 7.5 in 9/2021 ± target is below 7 for most endocrinologists), his vision should remain at this level into the foreseeable future.

*Id.*   Based on Dr. Greene's uncontroverted medical assessment, it cannot be said that the United States was negligent where no injury occurred.  There simply is no evidence that the United States owed Plaintiff a duty, breached a duty or that any alleged breach caused an injury.  As such, the United States is entitled to summary judgment.

### B.  Eighth Amendment Claim

Plaintiff alleges that on April 18, 2016, Defendant, Health Services Assistant Rebecca Peters "lied and said [Plaintiff] refused a retinopathy exam," resulting in "emotional duress, mental anguish and physical injury" in violation of Plaintiff's "Eighth Amendment right against deliberate indifference."  (Doc. 1).

In *Bivens*, the Supreme Court recognized that a plaintiff may bring an implied damages remedy against a federal official for violation of the plaintiff's Fourth Amendment right to be free from unreasonable searches, despite the fact that no federal statute or constitutional provision allowed such a cause of action.  *Bivens*, 403 U.S. at 397.  Since that decision, the Supreme Court has only recognized an implied damages remedy against a federal official in two other cases: *Davis v. Passman*, 442 U.S. 228, 245 (1979) (recognizing an implied cause of action for sex discrimination under the Fifth Amendment), and *Carlson v. Green*, 446 U.S. 14, 18–23 (1980) (recognizing an implied cause of action for inadequate medical care under the Eighth Amendment).  *Mack v. Yost*, 968 F.3d 311, 314 (3d. Cir. 2020).

In the absence of Supreme Court extensions of the implied damages remedy under

*Bivens*, lower federal courts recognized that they had the power to extend *Bivens* to new fact situations in appropriate circumstances. *See id*. at 319.  That changed with the Supreme Court's decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).

In *Ziglar*, the Supreme Court considered several Bivens claims brought to enforce the plaintiff's rights under the Fourth and Fifth Amendments, all of which were factually distinct from the claims in *Bivens*, *Davis*, and *Carlson*.  *Id*. at 1853–54.  In analyzing the claims, the court noted that it had taken a much more cautious approach to implying causes of action in the years since *Bivens* had been decided.  *Id*. at 1855–56.  Given that more cautious approach, the court acknowledged that the decision in *Bivens*, *Davis*, and *Carlson* "might have been different if they were decided today."  *Id*. at 1856.  The Supreme Court instructed lower courts to be cautious in extending *Bivens* remedies to new contexts, noting that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," and that decisions of whether to recognize new causes of action should generally be left to Congress.  *Id*. at 1857 (quoting *Iqbal*, 556 U.S. at 675).

Under *Ziglar*, a court presented with a *Bivens* claim must conduct a two-part analysis.  *Mack*, 968 F.3d at 320.  First, the court "must determine whether the Bivens claim presents a 'new context.' "  *Id*. (quoting *Ziglar*, 137 S. Ct. at 1859).  A case presents a new context if "is different in a meaningful way from previous *Bivens* cases decided by the Supreme Court."  *Id*. (internal alterations omitted) (quoting *Ziglar*, 137 S. Ct. at 1859). The difference between the two cases does not need to be stark, because "a modest extension

is still an extension." *Id*. (quoting *Ziglar*, 137 S. Ct. at 164).  Second, if the case presents a new context, the court "must then determine if there are 'special factors counselling hesitation' in expanding *Bivens*." *Id*. (quoting *Ziglar*, 137 S. Ct. at 1857).  This determination "concentrate[s] on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id*. (quoting *Ziglar*, 137 S. Ct. at 1857–58.)  "If 'there are any special factors that counsel hesitation,' courts must 'reject the request' to expand *Bivens*." *Id*.  (quoting *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020)).

    More recently, however, on June 8, 2022, the Supreme Court decided *Egbert v. Boule*, 142 S. Ct. 1793 (2022).  In that case, the Supreme Court clarified the framework that courts are to use before implying a cause action for money damages in a new *Bivens* context.  In particular, the Supreme Court recognized its precedents that describe the two-part inquiry but explained that these two parts "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy."  *See id*. at 1803.  The Supreme Court further explained that "[i]f there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy."  *See id*. (citation and internal quotation marks omitted).

    Thus, the outcome of *Egbert* is—essentially—that extending a *Bivens* remedy to a new context will be unavailable in all but the most unusual of cases.  *See id*. (instructing that "[i]f there is a rational reason" to think that Congress is better equipped to create a damages

remedy, "as it will be in most every case, ... no *Bivens* action may lie").   In other words, the

Supreme Court has "all but closed the door on *Bivens* remedies."   *See Dyer v. Smith*, 56

F.4th 271, 277 (4th Cir. 2022) (citation omitted).

Plaintiff's complaint attempts to bring a *Bivens* claim in the context of deliberate

indifference to a severe medical need.  (Doc. 1).  Plaintiff's deliberate indifference claim is not

a new context under *Bivens*.  The Court, having determined that a *Bivens* remedy is available

for Plaintiff's Eighth Amendment deliberate indifference claim against Defendant Peters, *see*

*Carlson*, 446 U.S. at 23-25 (extending an implied cause of action for money damages

pursuant to *Bivens* under the Eighth Amendment's Cruel and Unusual Punishment Clause in

the prison medical care context); *Shorter v. United States*, 12 F.4th 366, 372 (3d Cir. 2021)

(explaining that "[i]f a case does not present a new *Bivens* context, the inquiry ends there,

and a *Bivens* remedy is available"), the Court addresses the merits of Plaintiff's Eighth

Amendment deliberate indifference claim.

To sustain a constitutional claim under the Eighth Amendment for deliberate

indifference to a serious medical need, a plaintiff must make (1) an objective showing that his

medical needs were serious, and (2) a subjective showing that the defendants were

deliberately indifferent to those medical needs.  *See Pearson v. Prison Health Serv.*, 850 F.3d

526, 534 (3d Cir. 2017).   A serious medical need is "one that has been diagnosed by a

physician as requiring treatment or is so obvious that a lay person would easily recognize the

necessity for a doctor's attention."  *Monmouth Cty. Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d

326, 346–47 (3d Cir. 1987) (citation omitted).  A prison official is deliberately indifferent when he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Moreover, when it comes to claims of deliberate indifference, there is a "critical distinction" between allegations of a delay or denial of a recognized need for medical care and allegations of inadequate medical treatment. *Pearson*, 850 F.3d at 535 (citation omitted).

However, "[p]rison medical authorities are given considerable latitude in the diagnosis and treatment of medical problems of inmates and courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment ... which remains a question of sound professional judgment.' " *Byrd v. Shannon*, No. 1:09-CV-1551, 2010 WL 5889519, at *4 (M.D. Pa. Nov. 24, 2010) (quoting *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979)).  Mere disagreement over proper treatment does not state a claim upon which relief can be granted.  *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990); *Monmouth Cty. Corr. Inst'l Inmates*, 834 F.2d at 346 ("Courts, determining what constitutes deliberate indifference, have consistently held that mere allegations of malpractice do not raise issues of constitutional import... Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation.").

Moreover, non-medical personnel, such as Health Services Assistant Peters, "are not deliberately indifferent under the Eighth Amendment simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison

doctor or because they deferred to the judgment of the medical staff treating the inmate." *Dunyan v. Pa. Dep't of Corr.*, No. 1:16-cv-02103, 2017 WL 3509243, at *7 (M.D. Pa. Aug. 16, 2017) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993)). The scienter requirement will only be imputed where they had a reason to believe prison doctors, or their assistants were mistreating or not treating a prisoner. *Id.*

Here, Plaintiff, in a very novel way, attempts to impose Eighth Amendment liability on Defendant Peters by claiming that she lied about Plaintiff refusing to sign the medical treatment refusal form and that Defendant Peters, in fact, prevented Plaintiff from attending his April 18, 2016 one-year follow-up diabetic retinopathy exam, causing Plaintiff to suffer a worsening condition of his eyes because of his missed appointment. Unfortunately, Plaintiff's theory is belied by the record.

Initially, the Court notes that Defendant Peters was not responsible for the Gate Pass program, and she is not responsible for ensuring inmates received or attended the appointments. The undisputed facts demonstrate that it is the inmate's responsibility to check for appointments daily and be at the appointment at the designated time. There is no record evidence that Defendant Peters, in any way, impeded or prevented Plaintiff from attending his medical appointment.

Regardless of the reason for Plaintiff's missed appointment, there is nothing in the record to suggest that the progression of his diabetic macular edema is somehow linked to the missed appointment. Here, the uncontested record and the undisputed expert medical

opinion of Dr. Green is that, despite any missed appointment in April, 2016, there was no delay in treatment as there was no delay in diagnosis.  Additionally, Dorsey's medical records indicate that there was no worsening of any condition related to the missed appointment.  Pursuant to his medical expertise, Dr. Greene concludes within a reasonable degree of medical certainty that Dorsey's prognosis following the missed appointment in 2016 was excellent.  Thus, the Court concludes that Plaintiff was not suffering from a serious medical need at the time of April 18, 2016 missed appointment and Defendant Peters was certainly not deliberately indifferent to that medical need.  As such, Defendant Peters is entitled to summary judgment.

## V.     Conclusion

Based on the foregoing discussion, the motion for summary judgment, filed on behalf of Defendants Rebecca Peters and the United States will be granted.  Plaintiff's motion for summary judgment will be denied.

A separate Order shall issue.

Dated: October ___, 2023

Robert D. Mariani
United States District Judge